# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**Not for Publication**

|  |  |
|---|---|
| POSCO DAEWOO AMERICA CORP., | |
| *Plaintiff,* | Civil Action No. 17-483 |
| v. | **OPINION** |
| ALLNEX USA, INC. and TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA , | |
| *Defendants.* | |

**John Michael Vazquez, U.S.D.J.**

This matter comes before the Court on Defendant Travelers Casualty and Surety Company of America's ("Travelers") motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). D.E. 6. Both Defendant Allnex USA, Inc. ("Allnex") and Plaintiff Posco Daewoo America Corp. ("Plaintiff" or "Daewoo") filed briefs in opposition, D.E. 13-14., to which Travelers replied, D.E. 16. With the leave of the Court, Plaintiff then filed a sur-reply brief. D.E. 21.[1] The Court reviewed all the submissions in support and in opposition, and considered the motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons stated below, Travelers' motion is **GRANTED**.

---

[1] In this Opinion Travelers' motion to dismiss (D.E. 6) will be referred to as "Travelers MTD." Allnex's brief in opposition (D.E. 13) will be referred to as "Allnex Opp." Daewoo's brief in opposition (D.E. 14) will be referred to as "Daewoo Opp." Travelers' reply brief (D.E. 16) will be referred to as "Travelers Rep." Daewoo's sur-reply brief (D.E. 21) will be referred to as "Daewoo S. Rep."

# I. BACKGROUND

## A. Factual Background[2]

Plaintiff is a corporation that, among other things, imports and exports chemicals. Allnex is in the business of supplying specialty chemicals. Plaintiff supplied Allnex with product for which Allnex owed payment. In early 2016 an impostor posing as an employee of Plaintiff's accounts receivable department, sent emails to an employee of Allnex. Compl. ¶¶ 2, 4-5; D.E. 1. Specifically, Plaintiff alleges that the impostor "used a computer to send fraudulent emails to Allnex requesting wire payments to four separate [Wells Fargo] bank accounts to satisfy outstanding receivables owed by Allnex to Daewoo."[3] Id. ¶ 5. Daewoo does not have any bank accounts with Wells Fargo. Id.

Allnex, without confirming the authenticity of the impostor's email or of the four Wells Fargo bank accounts,[4] wired three separate payments to the Wells Fargo accounts on February 11, 2016, March 22, 2016, and April 1, 2016. Id. ¶ 6. The wired payments totaled $630,058. Id. The transfers did not go smoothly. After Allnex wired the first payment of $140,800 to an

---

[2] The factual background is taken from Plaintiff Daewoo's Complaint, D.E. 1-1, as well as from the Wrap and Crime Insurance Policy ("the Policy"), No. 106053220, Travelers MTD, Ex. A; D.E. 6. When reviewing a motion to dismiss, the Court accepts as true all well-pleaded facts in the Complaint. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). In addition, the Court may consider any document integral to or relied upon in the Complaint. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citing *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997)). In this motion, the Policy is referenced in the Complaint, and all parties agree that it is authentic and is critical to deciding the current motion.

[3] Allnex claims that the impostor hacked into Daewoo's computer system to send the fraudulent emails. Allnex Opp. at 1; D.E. 13. Plaintiff repeats this allegation for the first time in its sur-reply brief. Plaintiff, however, did not allege in its Complaint that the impostor hacked into its computer system. As a result, the Court does not consider this factual allegation in deciding the current motion.

[4] Allnex denied this allegation in its Answer. D.E. 12.

account numbered 3xxxxxx378, the impostor emailed Allnex that there was a "mix-up/typo" and asked Allnex to wire the other payments to an account numbered 2xxxxxx238. *Id.* ¶ 7. Less than a month later, the Daewoo impostor emailed Allnex to once again change the receiving bank account to one numbered 2xxxxxx346. *Id.* When this third account rejected two payments from Allnex, the impostor gave Allnex a fourth account numbered 2xxxxxx246. *Id.* Allnex then completed the payment by wiring money to this fourth account. *Id.*

After the fraud was discovered, Allnex recovered $262,444 of the stolen $630,058. *Id.* ¶ 9. The impostor apparently transferred the rest of the money, $367,613.46, from the Wells Fargo accounts to Shanghai, China. *Id.* Daewoo alleges that Allnex owes it the remaining $367,613.46 to satisfy the original outstanding receivables. Allnex disagrees, contending that the unrecovered wire payments to the impostor satisfy the balance it owed to Daewoo. *Id.* ¶ 10.

Daewoo also had an insurance policy with Travelers pursuant to which Daewoo contends that Travelers should indemnify it for the losses caused by the imposter. *Id.* ¶ 31. Travelers issued Daewoo the Wrap and Crime Insurance Policy ("the Policy"), No. 106053220, for the policy period of February 1, 2015 – February 1, 2016. Travelers MTD, Ex. A at 1; D.E. 6. Daewoo paid $8,156 for the Policy. Compl. ¶ 21. The parties do contest the validity of the Policy during the relevant time period.

Under the Policy, Travelers insured Daewoo for several types of loss resulting from criminal activity. Relevant here, the Policy provided Daewoo with insurance for loss incurred due to computer crime. The Policy language at issue, concerning what computer crime means, reads as follows:

> F. Computer Crime
>
> 1. Computer Fraud

> The Company will pay the **Insured** for the **Insured's** direct
> loss of, or direct loss from damage to, **Money**, **Securities**,
> and **Other Property** directly caused by **Computer Fraud**.

Travelers MTD, Ex. A at 3 (emphasis in original).[5]  All bolded terms are separately defined in the

Policy.

The Policy further defines the term computer fraud to mean:

> The use of any computer to fraudulently cause a transfer of **Money**,
> **Securities**, or **Other Property** from the inside the **Premises** or
> **Financial Institution Premises**:
> 1. to a person (other than a **Messenger**) outside the **Premises or
> Financial Institution Premises**; or
> 2. to a place outside the **Premises** or **Financial Institution
> Premises**.

*Id.* at 7 (emphasis in original).[6]

Daewoo alleges that "there is no legitimate question that 'computer fraud,' as defined by

the Policy, set into operation a chain of causation that resulted in a loss to Daewoo." Compl. ¶

27.  Daewoo asserts that the impostor "used a computer to cause the fraudulent transfer of

---

[5] The Policy does not define the term "direct loss."  Compl. ¶ 22.

[6] The Policy also defines several other terms that are relevant in this case:

> W. **Financial Institution** means:
>
> > 1. a bank, trust, company, savings bank, credit union,
> > savings and loan association or similar thrift institution; or
> > 2. stock brokerage firm, mutual fund, liquid assets fund or
> > similar investment institution.
>
> X. **Financial Institution Premises** means the interior of that portion
> of any building occupied by a **Financial Institution** (including any
> night depository chute and any safe maintained by such **Financial
> Institution**), transfer agent or registrar or similarly recognized place
> or safe deposit."

*Id.* at 10 (emphasis in original).

hundreds of thousands of dollars belonging to Daewoo to other parties." *Id.* The Policy's

defines money and other property as follows:

> II. **Money** means a medium of exchange in current use and authorized or adapted by a domestic or foreign government, including currency, coins, bank notes, bullion, travelers' checks, registered checks and money orders held for sale to the public.
>
> . . .
>
> KK. **Other Property** means any tangible property other than **Money** and **Securities** that had intrinsic value.

*Id.* at 12 (emphasis in original).

Finally, and critically, the Policy limits the property covered as follows:

> 5. Ownership of Property; Interests Covered
>
>> a. The property covered under this **Crime Policy** except as provided in 5.b. below is limited to a property:
>>
>>> i. that the **Insured** owns or leases;
>>>
>>> ii. that the **Insured** holds for others:
>>> (a) on the **Insured's Premises** or the **Insured's Financial Institution Premises**; or
>>> (b) while in transit and in the care and custody of a **Messenger**; or
>>>
>>> iii. for which the **Insured** is legally liable, except for property located inside the **Insured's Client's Premises** or the **Insured's Client's Financial Institution Premises**.

*Id.* at 17 (emphasis in original).

To recover its claimed loss, Daewoo submitted an insurance claim to Travelers.

Travelers denied coverage. Daewoo alleges Travelers improperly denied coverage. Compl. ¶¶

28-31.

### B. Procedural History

On December 15, 2016, Daewoo filed a Complaint against Allnex and Travelers in the Superior Court of New Jersey, Bergen County, Law Division. D.E. 1. Daewoo's claims against Travelers was based on the "Computer Fraud" Provision in the Policy. *Id.* ¶¶ 20-21, 23, 27, 29. Travelers removed the case to federal court on January 24, 2017. *Id.* Travelers then moved to dismiss this action pursuant to Rule 12(b)(6). D.E. 6. Both Allnex and Daewoo opposed Travelers' motion. D.E. 13-14. Travelers replied to this opposition. D.E. 16.

On March 27, 2017 the case was reassigned from Judge Cecchi to the undersigned. D.E. 19. Plaintiff sought the Court's permission to file a sur-reply brief. D.E. 17. The Court granted Plaintiff's request, and Plaintiff filed a sur-reply brief on April 11, 2017. D.E. 19, 21. Plaintiff then submitted a letter asking the Court to consider the case of *Medidata Solutions, Inc. v. Federal Insurance Co.*, Case No. 1:15-cv-907 (ALC), 2017 WL 3268529, at *5 (S.D.N.Y. July 21, 2017). D.E. 23. Travelers submitted a letter refuting Plaintiff's interpretation of *Medidata Solutions.* D.E. 24. It then submitted a second letter asking the court to consider the case of *American Tooling Center, Inc. v. Travelers Casualty and Surety Company of America*, No. 16-cv-12106, 2017 WL 3263356 (E.D. Mich. Aug. 1, 2017). D.E. 25.

## II.    **LEGAL STANDARD**

Rule 12(b)(6) governs motions to dismiss for "failure to state a claim upon which relief can be granted." For a complaint to survive dismissal under the rule, it must contain sufficient factual matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than

a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims." *Id.* at 789.

In evaluating the sufficiency of a complaint, district courts must separate the factual and legal elements. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-211 (3d Cir. 2009). Restatements of the elements of a claim are legal conclusions, and therefore, not entitled to a presumption of truth. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011). The Court, however, "must accept all of the complaint's well-pleaded facts as true." *Fowler*, 578 F.3d at 210. In deciding a motion to dismiss the Court may also consider any "document integral to or explicitly relied upon in the complaint." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quotation & emphasis omitted)). Even if plausibly pled, however, a complaint will not withstand a motion to dismiss if the facts alleged do not state "a legally cognizable cause of action." *Turner v. J.P. Morgan Chase & Co.*, No. 14-7148, 2015 WL 12826480, at *2 (D.N.J. Jan. 23, 2015).

### III.   LEGAL ANALYSIS

This case is before the Court on diversity jurisdiction, 28 U.S.C. § 1332. The Court, therefore, interprets the contract language in the Policy under the substantive law of the state whose laws govern the action. *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 378 (3d Cir. 1990) (citing *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938)). As an initial matter, the parties appear to assume that New Jersey substantive law applies to the alleged facts of this case. Seeing no clear reason to deviate from the parties' assumptions, the Court will apply New Jersey

law.[7] *See Manley Toys, Ltd. v. Toys R Us, Inc.*, 2013 WL 244737, at *2 (D.N.J. Jan. 22, 2013) ("Because the parties have argued the viability of the remaining claims as though New Jersey substantive law applies, the Court will assume that to be the case.") (citing *USA Mach. Corp. v. CSC, Ltd.*, 184 F.3d 257, 263 (3d Cir. 1999)). Even though the parties assume that New Jersey law applies, they surprisingly do not cite to New Jersey precedent when actually interpreting the Policy language. Instead, they rely upon cases from a myriad of jurisdictions without explaining why they are foregoing New Jersey law.

Under New Jersey law when the terms of an insurance contract are clear "it is the function of a court to enforce it as written and not make a better contract for either of the parties." *Resolution Tr. Corp. v. Fid. & Deposit Co. of Maryland*, 205 F.3d 615, 643 (3d Cir. 2000) (citing *New Jersey v. Signo Trading Int'l, Inc.*, 130 N.J. 51, 63 (1992) (citation and internal quotation marks omitted)). However, when ambiguities in an insurance contract exist, New Jersey law requires that "any ambiguities in an insurance contract be resolved in favor of the insured. *Id.* (citing *Pittston Co. Ultramar Am. Ltd. v. Allianz Ins. Co.*, 124 F.3d 508, 520 (3d Cir. 1997)). "An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations." *Kaufman v. Provident Life & Cas. Ins. Co.*, 828 F. Supp. 275, 283 (D.N.J. 1992), *aff'd*, 993 F.2d 877 (3d Cir. 1993) (citing *Mellon Bank N.A. v. Aetna Business Credit Inc.*, 619 F.2d 1001, 1011 (3d Cir. 1980)). New Jersey law considers ambiguities to exist "in an insurance contract where 'the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage.'" *Resolution Tr. Corp.*, 205 F.3d at 643 (quoting *Weedo v. Stone–E–Brick, Inc.*, 81 N.J. 233, 247 (1979)).

---

[7] Moreover, Daewoo's principal address is listed as Teaneck, New Jersey in the Policy. Further, the Policy includes a "New Jersey Cancellation or Termination Endorsement" section. Traveler's MTD, Ex. A, page ID 75.

Here, the parties raise numerous issues of contract interpretation concerning language in the Policy.[8] For example, the parties disagree on whether the facts in this case trigger coverage under the Policy's Computer Fraud provision. As stated above, the Policy's Computer Fraud provision reads: "[t]he Company will pay the **Insured** for the **Insured's** direct loss of, or direct loss from damage to, **Money, Securities**, and **Other Property** directly caused by **Computer Fraud**." Travelers MTD, Ex. A at 3 (emphasis in original). Travelers contends that under the Policy computer fraud "occurs when someone hacks or obtains unauthorized access to or entry to a computer in order to make an unauthorized transfer." Travelers Rep. at 11; D.E. 16. In support of its position Travelers points to several non-controlling cases, including *Apache Corp. v. Great American Ins. Co.*, where the Fifth Circuit found that an imposter's email was part of the fraud scheme, but that without more computer use, such as hacking, allowing that email to trigger computer fraud insurance coverage would "convert the [insurance policy's] computer-fraud provision to one for general fraud." 662 F. App'x 252, 258 (5th Cir. 2016).

Plaintiff disagrees with Travelers' more restrictive definition of computer fraud. Plaintiff argues that "[t]he definition of computer fraud in the Policy expansively refers to the use of *any* computer to commit fraud." Daewoo S. Rep. at 1(emphasis in original); D.E. 21. Plaintiff, therefore, contends that the imposter's use of a computer to send an email qualifies as computer

---

[8] Of note, Plaintiff in its opposition brief, also cites to the term "Theft" in the Policy. Daewoo Opp. at 10. However, Plaintiff did not plead that theory in its Complaint, instead relying on the "Computer Fraud" provision. As a result, Plaintiff cannot rely on the new theory in its motion papers. *Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984)). Nevertheless, because of the Ownership provision in the Policy, the Court's analysis would not change even if Plaintiff had alleged theft under the Policy.

fraud. *Id.* at 4.[9] To support its position Plaintiff also points to non-controlling cases, including *Medidata Solutions,* where the Southern District of New York found that a spoofed email, which led to a theft, qualified as computer fraud under the relevant insurance policy. WL 3268529, at *5. Thus, Plaintiff and Travelers argue for differing interpretations of what constitutes computer fraud under the Policy.

The parties also disagree over what qualifies as a "direct loss" under the Policy's Computer Fraud provision.[10] The parties agree that an intervening event took place between the impostor sending Allnex an email, purportedly from Plaintiff's representative, and the money appearing in the Wells Fargo accounts. Specifically, an Allnex employee (or employees) reviewed the fraudulent email and then caused the wires to be sent. The Policy does not define the term "direct loss." Compl. ¶ 22. Travelers argues that direct loss is a resulting immediate loss to the insured party, in other words, the loss occurs without intervening events. *See* Travelers Rep. at 6-7. To support this interpretation, Travelers cites *Fireman's Fund Ins. Co. v.*

---

[9] Allnex apparently agrees with Plaintiff's more expansive reading of computer fraud. However, Allnex in alleging computer fraud claims that that the impostor "apparently" sent the email from Plaintiff's computer server. Allnex Opp. at 1; D.E. 13. Plaintiff later parrots this claim – that its computer system was hacked by the impostor – in its sur-reply. Daewoo S. Rep. at 1; D.E. 21. Critically, however, Plaintiff does not allege that the impostor hacked into its computer system in the Complaint. As a result, and as noted in note 3 *supra*, the Court does not consider the hacking allegations in deciding this motion.

[10] Although neither party cites to New Jersey law on this issue, New Jersey applies the proximate cause standard for determining whether a loss qualifies as a direct loss in the insurance context. *Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc.,* 181 N.J. 245, 259 (2004) (holding that "[i]n view of the prevailing approach taken by courts in New Jersey and elsewhere to defining direct loss, in whatever type of policy that term arose, we adopt the conventional proximate cause test as the correct standard to apply when determining whether a loss resulted from the dishonest acts of an employee").

*Special Olympics Int'l, Inc.*, where the court found that an "insured does not suffer a direct loss unless the insured's assets, and not those of a third party, are reduced because of the offending employee's wrongful conduct." 249 F. Supp. 2d 19, 27 (D. Mass.), *aff'd on other grounds,* 346 F.3d 259 (1st Cir. 2003).

In contrast, Plaintiff and Allnex argue that a loss resulting from an event in a chain of events can qualify as a direct loss. *See* Daewoo Opp. at 16; D.E. 14; Allnex Opp. at 3-4. In other words, an intervening event does not necessarily foreclose the finding of a direct loss according to Plaintiff and Allnex. To support its definition of direct loss, Allnex looks to *Frazier Indus. Co. v. Navigators Ins. Co.*, 149 F. Supp. 3d 512, 519-520 (D.N.J. 2015). In short, the parties disagree over the scope of the "direct loss" requirement.

While aware of these disagreements, the Court finds the Policy's "Ownership of Property; Interests Covered" provision dispositive and, therefore, does not reach the correct interpretation of "Computer Fraud" or "direct loss" under the Policy. As stated above, the plain language of the Policy's Ownership provision limits covered property to three scenarios. The first is when Daewoo holds property for others. This provision is inapplicable here. The second is property for which Daewoo is "legally liable." Again, this is inapplicable. The final provision concerns property that Daewoo "owns or leases." Leased property is not at issue, so Daewoo only has coverage if it "own[ed]" the property, that is, if Daewoo owned the money that Allnex wired to the Wells Fargo accounts.

Plaintiff has not plausibly pled that it owned the property, the wired payments, it now seeks insurance coverage for under the Policy. The Policy does not define "own." Daewoo Opp. at 8. As also discussed above, New Jersey law states that "words of an insurance policy are to be given their plain, ordinary meaning." *Zacarias.*, 168 N.J. at 595. When interpretation is

required, "courts interpret the contract to comport with the reasonable expectations of the insured[.]" *Id.* To determine the plain meaning of the word "owns" as a reasonable person in the insured's shoes would understand it, the Court looks to the dictionary definition. *See Aleynikov v. Goldman Sachs Grp., Inc.*, 765 F.3d 350, 360 (3d Cir. 2014) (finding that "dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract") (citing *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006)).

Here, Black's Law Dictionary is instructive. Black's Law Dictionary defines "own" as meaning "[t]o rightfully have or possess as property; to have legal title to." (10th ed. 2014).[11] Plaintiff has not plausibly pled sufficient facts for the Court to find that it rightfully had, possessed, or had legal title to the money Allnex transferred into the Wells Fargo accounts. Plaintiff's strongest claim to owning that money stems from Allnex's intention. The parties do

---

[11] The Court does not find either Travelers' or Daewoo's proposed definitions of "owns" to be persuasive. Citing to *Meriter Health Services, Inc. v. Travelers Cas. and Surety Co.*, 313 Wis. 2d 660, 670 (WI App. 2008), Travelers argues that the words "owns" is not ambiguous and that the court in *Meriter* found that "possession and control" are critical in determining ownership. Of course, using "possession and control" as the benchmark would mean that the impostor here owns the money he or she stole. Such is obviously not the case.

Daewoo, on the other hand, argues that "owns" is not defined in the Policy and is an ambiguous term. Daewoo then cites to numerous dictionary definitions for the word "ownership," "equitable owner," and "owner." Daewoo Opp. at 4-5; D.E. 14. Tellingly, Daewoo does not actually cite to a definition of "own." In citing to the *Business Dictionary*'s definition, Daewoo indicates that "owner" means an "[e]ntity that has an *enforceable claim* or title to an asset or property, and is recognized as such by law. For example, "a lender is the legal owner of a property (mortgaged as a collateral for payment of a loan) by a borrower who is its legal possessor and retains only the right of redemption in it." *Id.* at 5. Of course, this case does not involve real property, such as a home and land. If it did, and Daewoo was the lender with a mortgage, it would have an ownership interest in the property until the loan was paid and the mortgage discharged. However, taking Daewoo's position to its logical extreme, it is arguing that once Allnex owed it money, Daewoo actually owned the money in Allnex's possession (to the extent necessary to pay the debt). Daewoo has not cited *any* support for this extremely broad view of ownership, nor could the Court find any.

not dispute that Allnex intended Plaintiff to receive the wired money as payment for a debt. Compl. ¶¶ 5-6. However, a party's intention of transferring legal title does not equate to an actual transfer of legal title without more. Here, Plaintiff does not allege more.

The following hypothetical is illustrative. Allnex owes Plaintiff payment for goods previously delivered, as here. Allnex plans to pay Plaintiff by way of check. An impostor comes to Allnex's business location and informs an Allnex employee that he is there on behalf of Plaintiff to retrieve the checks, and Allnex gives the impostor the checks. The impostor absconds. Plaintiff does not own the checks. The funds still legally belong to Allnex (although in possession of the impostor); Allnex cannot tell Plaintiff that Plaintiff now owns the checks and must retrieve them from the impostor. Plaintiff has a right to collect its owed payment, with a potential cause of action to enforce that right. It, however, did not come to *own* the checks simply from Allnex transferring possession of them to the impostor, even though Allnex intended for the money to be delivered to Plaintiff.

Another example is also apt. Again, Allnex owes Plaintiff for goods previously delivered. In this scenario, no impostor is involved. Instead, Allnex mistakenly (but not in bad faith) wires the funds to the wrong account. Plaintiff does not own the funds in the wrong account. Allnex cannot inform Plaintiff that it has to retrieve the funds from the wrong account because Plaintiff now "owns" them; Plaintiff cannot legally access the funds in an account other than its own. Here too, Plaintiff does not *own* the wired funds even though Allnex again intended for them to be delivered to Plaintiff.

The first hypothetical deals with facts analogous to the present situation although a computer was not used. The second hypothetical does not concern malfeasance by any third

party. Yet, both examples are used to demonstrate the limits of what Plaintiff "owns" – the key provision in the Policy.

The Court agrees with Travelers that before Daewoo actually received the monies due, Daewoo owned a receivable, or a right to payment, as well as a potential cause of action for payment if it was not made. *See* Travelers Rep. at 6 (indicating that at best, Daewoo has an "inchoate chose-in-action" as to the money owed by Allnex). In other words, Daewoo did "own" something of value, but it was not the cash in the Wells Fargo accounts. It owned a receivable and a potential cause of action if Allnex did not pay. Much of Daewoo's argument is either in the form of rhetorical questions (not legal analysis) or irrelevant information. As an example of the rhetorical questions, Daewoo asks, "why was Allnex attempting to wire the funds to Daewoo, and why did Allnex later forward recovered funds to Daewoo?" Daewoo Opp. at 12. Besides lacking analysis, the rhetorical questions focus on Allnex's intent to transfer ownership rather than whether the transfer was successful. Importantly, Daewoo does not provide any legal support for its argument. As to information which is not pertinent, Daewoo quotes extensively from the "Prefatory Note of National Conference of Commissioners on Uniform State Laws and the American Law Institute" regarding UCC 4A and the process of transferring funds electronically. *Id.* at 15-16. Yet, this information merely describes the mechanics (and related terminology) of wiring funds; it does not address the critical issue here, that is, who owns the funds.

In sum, Plaintiff has not plausibly alleged that the money transferred from Allnex to the Wells Fargo accounts was owned by Plaintiff under the Policy. As a result, Plaintiff has failed to state a claim upon which relief may be granted as against Travelers.

## V. **CONCLUSION**

Therefore, for the reasons discussed above, the Court **GRANTS** Travelers' motion to dismiss without prejudice. Plaintiff has thirty (30) days to file a second amended complaint, if it so chooses, consistent with this Opinion. If Plaintiff does not do so, this matter will be dismissed with prejudice. An appropriate Order accompanies this opinion.

Dated: October 31, 2017

John Michael Vazquez, U.S.D.J.